IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| VIVIAN HANDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-17-WKW |
| | ) | [WO] |
| ALABAMA DEPARTMENT | ) | |
| OF LABOR, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Vivian Handy sues her former employer, the Alabama Department of Labor, for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII").  Plaintiff, who is African American, brings claims for racial discrimination and retaliation in her termination as a high-level administrator and for a racially hostile work environment.  Defendant has moved for summary judgment on all claims (Docs. # 24–26), and Plaintiff has responded in opposition (Doc. # 28).  After careful consideration of the arguments of counsel and the applicable law, the court finds that Defendant's motion for summary judgment is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

2

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND[1]

Plaintiff worked in human resources at Alabama state agencies for more than thirty years. Most recently and until her termination, she was employed by the Alabama Department of Labor ("ADOL"). For context, the narrative begins in August 2014, when Fitzgerald Washington was appointed as ADOL's agency head. Things began well between Plaintiff and her new boss, Mr. Washington, who like her is African American. Mr. Washington promoted Plaintiff in January 2016 to the position of labor administrator, which placed her in the top four wage earners at ADOL.[2]

---

[1] Defendant objects that Plaintiff fails to properly support some of her assertions of fact and that some materials upon which Plaintiff relies cannot be reduced to admissible form. (Def. Summ. J. Reply Br., at 2–8 (Doc. # 29).) Unsupported assertions of fact have not factored into the analysis, and only evidence that is admissible on its face or can be reduced to admissible form has been considered. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Macuba v. DeBoer*, 193 F.3d 1316, 1322–24 (11th Cir. 1999); Fed. R. Civ. P. 56(c)(2), (e).

[2] The labor administrator is classified as an exempt service position. *See* Ala. Code § 36-26-10(b)(1). The labor administrator "serve[s] at the pleasure of the appointing authority" (*e.g.*, Secretary Washington), and the position "allows for increased flexibility as to duties and

While serving as the labor administrator, there was a series of separate events beginning in October 2017 and continuing through July 2019 that led Mr. Fitzgerald to question Plaintiff's professional judgment.  (Washington Decl. ¶¶ 13–14, 18–22, 28–30, 35–38, 40–42 (Doc. # 26-1).)   Two events involved her management approach to inappropriate conduct by two male employees at work socials.  (Washington Decl. ¶¶ 13–14, 18–22.)   Another event involved her handling of a training session.  (Washington Decl., ¶¶ 28–30.)  There were others.  Based on the totality of these events, Mr. Washington decided to terminate Plaintiff effective December 31, 2019.  Mr. Washington orally notified Plaintiff of her impending termination on July 16, 2019.  (Pl. Dep., at 198, 256–57 (Doc. # 26-2).)  Since Plaintiff's termination, Plaintiff's position has remained vacant, and Mr. Washington "ha[s] no plans to fill it."  (Washington Decl. ¶ 43.)

Plaintiff believes that Mr. Washington terminated her because she is African American and not for the reasons he asserts.  She also contends that he fired her with retaliatory intent because on January 29, 2019, she requested the EEO manager (Tonya Scott) to investigate what she perceived was a racially motivated hiring by Mr. Washington of a white individual to a director position.  (Pl. Br. in Opposition to Summ. J., at 36–37 (Doc. # 28)); *see also* Pl. Dep., at 505–06 (affirming that she

---

compensation than that permitted within the Alabama State Personnel Department's classifications within the State Merit system."  (Washington Decl. ¶¶ 9–10 (Doc. # 26-1).)

complained to the EEO manager that Washington's appointment of a named white individual "might be an illegal appointment influenced by race"); *see also* Pl. Dep., at 262–63, 280–84, 501–02; Pl. Am. EEOC Charge, at 2 (Doc. # 268-28).)  But Mr. Washington denies that, at the time he notified Plaintiff of her termination, he knew about Plaintiff's complaint to Ms. Scott concerning the hiring of the white director. (Washington Decl. ¶ 26 (Doc. # 26-1); Washington Dep., at 134–36 (Doc. # 26-50).) In fact, Ms. Scott never conducted the investigation.  (Scott Decl. ¶ 18 (Doc. # 26-53).)  Nor did Ms. Scott inform Mr. Washington of Plaintiff's complaint.  (Scott Decl. ¶ 18.)

Finally, Plaintiff contends that Mr. Washington is not the only employee who had it out for her, but so did Renee Minor, a white human resources division director who filled Plaintiff's former position.  Plaintiff believes that Ms. Minor came to view her as a professional rival and that Ms. Minor and Mr. Washington combined forces to mistreat her, thus, creating a racially hostile work environment.[3]  (Pl. Br. in Opposition to Summ. J., at 33–35.)

## IV.  DISCUSSION

Plaintiff brings three Title VII claims alleging (1) a retaliatory termination, (2) a racially discriminatory termination, and (3) a racially hostile work

---

[3] The individual acts of Mr. Washington and Ms. Minor are incorporated into the discussion of the pertinent legal issues.

environment.   All claims fail to survive scrutiny under the summary judgment standard.

## A.     Title VII Retaliatory Termination Claim (Prima Facie Case)

Plaintiff alleges that Mr. Washington fired her in retaliation for protesting that his hiring of a white director was influenced by impermissible racial considerations. Title VII prohibits retaliation against an employee for opposing a discriminatory employment practice.  42 U.S.C. § 2000e–3(a).  Where there is no direct evidence of retaliation, as in this case, the *McDonnell Douglas* burden-shifting framework applies to analyze an employee's claim.  *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under this framework, the employee first must establish a prima facie case of retaliation by showing "(1) that [s]he engaged in statutorily protected expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events."  *Id.* (citation and internal quotation marks omitted).  If the employee demonstrates a prima facie case of retaliation, the burden shifts to the employer to show a non-retaliatory reason for the adverse employment action.  *See id.*  If the employer succeeds, the employee must satisfy the "but for" test pronounced in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013).  *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citing *Gogel v. Kia Motors Mfg. of Ga.,*

*Inc.*, 967 F.3d 1121, 1135 n.13 (11th Cir. 2020) (en banc)).  "That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." *Id.*

Defendant contends that Plaintiff's prima facie case fails on the third element. To establish a causal connection at the prima facie stage, a plaintiff must show two things.  First, she must demonstrate that "the decisionmaker actually knew about the employee's protected expression."  *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020).  The knowledge "requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him."  *Brungart v. BellSouth Telecommuns., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  Therefore, "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct" generally extinguishes any causal connection between the protected activity and the adverse employment action.  *Id.*; *see also Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression."), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

7

Second, a plaintiff must demonstrate that "the protected activity and the adverse action were not wholly unrelated." *Tolar*, 997 F.3d at 1294 (citation and quotation marks omitted). This standard is met where there is "close temporal proximity" between the statutorily protected activity and the adverse action; however, absent other evidence of causation, the temporal proximity "must be very close." *Id.* (citation and quotation marks omitted). When close temporal proximity is lacking, a plaintiff can show causation "where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity." *Boyland v. Corrs. Corp. of Am.*, 390 F. App'x 973, 974–75 (11th Cir. 2010) (citing *Bass*, 256 F.3d at 1095). "[T]he intervening retaliatory acts must be material to infer a causal link." *Baroudi v. Sec'y, U.S. Dep't of Veterans Affs.*, 616 F. App'x 899, 903 (11th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)). An act is material if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and quotation marks omitted). "[M]aterial adversity" is required in order "to separate significant from trivial harms." *Id.* at 69–70.

Plaintiff has failed to raise a genuine dispute of material fact on causation at the prima facie stage. The evidence is undisputed that the decision maker (Secretary Washington) did not learn about Plaintiff's alleged protected activity until after he

had notified Plaintiff of her termination.[4]   Specifically, in his declaration, Mr. Washington testified that, at no point did the EEO manager inform him of Plaintiff's request for an investigation into the challenged hiring.[5]   Rather, he learned for the first time about Plaintiff's request for an internal investigation into the hiring when he reviewed Plaintiff's amended EEOC charge, which was filed on September 12, 2019.  (Washington Decl. ¶ 26); Pl. Am. EEOC Charge.)  The amended EEOC charge was filed *after* Mr. Washington had notified Plaintiff on July 16, 2019, that she would be terminated effective December 31, 2019.  (Washington Decl. ¶ 26; Pl. Dep., at 198, 256–57.)   Mr. Washington's declaration is consistent with his deposition.  (*See* Washington Dep., at 134–36.)  Mr. Washington's testimony also is corroborated by the EEO manager (Tonya Scott), who attests that she did not share with Mr. Washington or with anyone else Plaintiff's concerns about the hiring of the white director.  (Scott Decl. ¶ 18.)  This evidence stands unrebutted.  Plaintiff has not offered any evidence that, at the time Mr. Washington notified Plaintiff of her termination, he knew that she had accused him of a potentially racially motivated

---

[4] Plaintiff contends that she engaged in a protected activity when she complained to Ms. Scott that Mr. Washington's hiring of a white director may have been racially motivated and then asked Ms. Scott to conduct an investigation. (*See* Pl. Br. in Opposition to Summ. J., at 36 (citing Pl. Dep., at 505–06).)  While Defendant argues that Plaintiff's evidence does not support her assertion of fact that she made "a direct report of illegal and racial hiring practices" (Def. Summ. J. Br., at 82–84), it is not necessary to address this argument in light of the other findings.  It is assumed for purposes of the discussion that Plaintiff engaged in a protected activity.

[5] In fact, the EEO manager never investigated the hiring.  (Scott Decl. ¶ 18.)

hiring of a white director.[6]  Plaintiff, therefore, cannot show a causal relationship between her termination and the protected activity.

Additionally, close temporal proximity between the protected activity and the adverse employment action is missing.  Plaintiff engaged in the protected activity on January 29, 2019; the adverse action (*i.e.*, notification of her termination) occurred on July 16, 2019.  Under binding precedent, the passage of six-and-half-months between these two events is not close as a matter of law.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citing with approval nonbinding cases rejecting three- to four-month gaps between the protected activity and the alleged retaliation); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").

---

[6] Plaintiff's brief in opposition to summary judgment misconstrues Mr. Washington's deposition testimony.  (Pl. Br. in Opposition to Summ. J., at 16, 39 (citing Washington Dep., at 136).)   At page 136 of his deposition, Mr. Washington was testifying about his present knowledge of her alleged protected activity, not what he knew when he notified her of her impending termination.  (*See also* Washington Dep., at 136–37 (Q: Did you ever hear from any source that Mrs. Handy was not happy about [the white director's] appointment? . . . A.  No. Q. You never heard it from anyone?  A.  No.").)   A contrary construction of Mr. Washington's testimony is unreasonable.  *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020) ("[A] jury finding that a decisionmaker was aware of an employee's protected conduct must be supported by reasonable inferences from the evidence . . . ." (citation and internal quotation marks omitted)).

Plaintiff argues, however, that she need not rely on temporal proximity alone to prove a causal connection but instead can prove causation based on a series of allegedly retaliatory acts linking her protected activity to the notification of her termination. She contends that, after she engaged in the protected activity on January 29, 2019, Mr. Washington subjected her to "increased criticism." (Pl. Br. in Opposition to Summ. J., at 39; *see also id.* # 28, at 29–33, 39–41).) That criticism, listed chronologically, is as follows:

(1)     Mr. Washington's criticism of Plaintiff's alleged lack of preparedness on a shared presentation on March 29, 2019, for which she was in charge (Pl. Dep., at 310–11);

(2)     Mr. Washington's removal of Ms. Scott from Plaintiff's supervision on May 1, 2019 (Pl. Dep., at 507);

(3)     Mr. Washington's criticism at the beginning of May 2019 that Plaintiff's written performance evaluation of Ms. Scott did not incorporate Ms. Scott's current work duties (Pl. Dep., at 329–30);

(4)     Mr. Washington's comment that Plaintiff disrupted a May 6, 2019 staff meeting by leaving three times to take phone calls from her ailing father's caregiver (Pl. Dep., at 322–24);

(5)   Mr. Washington's email dated May 6, 2019, to Plaintiff stating that she should ensure that her staff finishes projects "in reasonable time for the outcome that lifts the agency" (May 6, 2019 Email (Doc. # 26-34); Pl. Dep., at 326–28));

(6)   Mr. Washington's freeze on June 10, 2019, of Plaintiff's future out-of-state travel, with the exception of the preapproved Miami trip ("travel freeze") (Def. Ex. 39 (Doc. # 26-41); Pl. Dep., at 417; Washington Dep., at 145); and

(7)   Ms. Minor's refusal in June and July 2019 to provide Plaintiff with a form detailing certain personnel transactions, a decision that Secretary Washington countenanced (Pl. Dep., at 182–84, 189, 191–92; Minor Dep., at 18–19);

All of the acts of which Plaintiff complains, except (1), fall short because they did not occur "shortly after" the protected conduct. *Boyland*, 390 F. App'x at 974. The earliest of the criticisms in (2) through (7), above, occurred at the beginning of May 2019 and the latest occurred in July 2019.   The three- to four-month gaps between the protected activity and these adverse acts again are too attenuated to establish a causal connection. *See Thomas*, 506 F.3d at 1364; *Drago*, 453 F.3d at 1308.   Mr. Washington's March 29, 2019 criticism of her presentation closes the gap in time to two months.   Whether this temporal connection is sufficiently close need not be decided:   Plaintiff does not rely on this criticism in the section of her brief addressing her retaliation claim (Doc. # 28, at 35), and, regardless, Plaintiff has not shown that the criticism reaches the threshold level of materiality.

12

On this record, all of the acts, (1)–(7), whether considered individually or cumulatively, are lacking the materiality that *Burlington Northern* requires.  Plaintiff submits no evidence that any of Mr. Washington's criticisms, all of which were oral, were documented in her personnel record.  She points to no evidence that she incurred any discipline or suffered any pecuniary consequences for these acts.  Nor has she shown that the criticisms tangibly affected her ability to perform her job; for example, as relates to the travel freeze, Plaintiff admits that travel was not a major component of her job.  (*See* Pl. Dep., at 410 ("[W]e don't travel that much.").)  Mr. Washington's treatment may have seemed harsh to Plaintiff.   However, nowhere does Plaintiff explain how a reasonable worker would have been dissuaded from reporting discrimination because of these criticisms, and evidentiary support for the assertion is lacking.

In sum, Plaintiff has not raised a genuine dispute of material fact concerning causation on her prima facie case.  She has not presented evidence that the decisionmaker (Mr. Washington) knew about the protected activity, and she has not demonstrated close temporal proximity or any other evidence suggesting a causal link between her protected activity and her termination.  Therefore, her prima facie case of retaliation fails.

**B.**     <u>**Title VII Racially Discriminatory Termination Claim (Prima Facie Case)**</u>

Plaintiff contends that Mr. Washington fired her because of her race in violation of Title VII.  (*See* Pl. Br. in Opposition to Summ. J., at 25.)  It is unlawful under Title VII for an employer to fire an individual because of that individual's race.  42 U.S.C. § 2000e–2(a)(1).  Like retaliation, discrimination may be proven by either direct or circumstantial evidence.  *Crawford v. Carroll*, 529 F.3d 961, 975–976 (11th Cir. 2008).  Proof by circumstantial evidence again invokes the burden-shifting *McDonnell Douglas* framework.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).

A plaintiff can establish a prima facie case of discrimination by showing that "(1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated employees outside her classification more favorably, and (4) she was qualified to do the job." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1288 (11th Cir. 2018).  Defendant challenges only the third element.

Under the third element, when a plaintiff compares herself to employees outside her protected class, she must name a comparator who is "similarly situated in all material respects" but who was treated more favorably.  *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc).  An adequate comparator generally "will have engaged in the same basic conduct (or misconduct) as the

plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," will "have been under the jurisdiction of the same supervisor," and will share the plaintiff's employment or disciplinary history. *Id.* at 1227–28.

Plaintiff has not identified an appropriate comparator. Plaintiff did not name one during her two-day deposition. On the first day of her deposition, Plaintiff testified that she could not "recall right now" any ADOL employee outside her protected class who was treated more favorably. (Pl. Dep., at 289.) On the second day of her deposition, Plaintiff did recall one white probationary employee whom Mr. Washington permitted to resign in lieu of termination, and she testified that his resignation proved that she was "treated differently from people who have been separated from the department." (Pl. Dep., at 564.) But this employee's resignation could not have formed the basis for Plaintiff's Title VII claim alleging a racially discriminatory termination for a simple reason: The white employee's separation from ADOL took place more than a year after Plaintiff filed her amended complaint. (*See* Pl. Dep., at 564–80; Washington Decl. ¶¶ 49–50.)

Moreover, Plaintiff does not explain how a probationary employee who was fired for stealing leave time, as she describes the offense (Pl. Dep., at 569), is "similarly situated" to her "in all material respects." *Lewis*, 918 F.3d at 1224. Plaintiff points to no evidence that she—a high-ranking exempt employee—and a probationary employee were subject to the same disciplinary rules, and she does not

present any basis for finding that they engaged in similar misconduct.  Plaintiff thus is left with her general assertion, embodied in a later-filed declaration, that Mr. Washington "treated white [employees] preferably on many occasions."  (Pl. Decl. ¶ 10.)  Generic references to nameless, description-less white employees do not answer how Plaintiff and the alleged comparators are "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1224.  Plaintiff's failure to identify a proper comparator is fatal to her prima facie case alleging a racially discriminatory firing.

Implicitly conceding the absence of a proper comparator, Plaintiff argues in her brief opposing summary judgment that she has satisfied her prima facie case based on what she contends is cumulative evidence of discriminatory acts taken against her by Mr. Washington and by Ms. Minor.  Plaintiff does not articulate her theory clearly or cite authority.  The theory might be this:  "A plaintiff will always survive summary judgment if [s]he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," and this evidence can encompass "systematically better treatment of similarly situated employees."  *Id.* at 1185 (cleaned up).  This theory, though, does not save Plaintiff's claim because she has not presented a single brush stroke, much less a mosaic, of circumstantial evidence sufficient to raise a genuine dispute of material fact that her termination was based on her race.

Plaintiff focuses on the acts of Ms. Minor and Mr. Washington.  First, Plaintiff contends that Ms. Minor, who is white, singled her out for excessive and unfounded criticism.  (Pl. Br. in Opposition to Summ. J., at 27–29 (detailing the criticisms with citations to the record).[7])   But Plaintiff provides no evidentiary foundation for her opinion that Ms. Minor's criticisms were the byproduct of racial animosity.  Plaintiff resorts solely to speculation and conjecture, offering not much more than the fact that Plaintiff and Ms. Minor are not the same race:  "[T]he fact" that Ms. Minor is white and that "I'm not, could, in my opinion, suggest that [she's] not viewing me as someone who's capable of making . . . important decisions for the department."[8]  (Pl. Dep., at 167–68.)  This sort of rank and highly speculative assertion of racial discrimination is not countenanced by the summary judgment rule.  *See Cordoba v.*

---

[7]  These criticisms are as follows:  (1) Ms. Minor's unsolicited suggestions to Plaintiff that two of Plaintiff's employees needed additional training in specified areas (Pl. Dep., at 135–40); (2) Ms. Minor's statement that she did not want to ask Plaintiff about a particular matter because she (Minor) thought it could result in a lawsuit (Pl. Dep., at 395); (3) Ms. Minor's removal of Plaintiff's email address from a weekly email distribution of state job listings (Pl. Dep., at 200–02, 214–15); (4) Ms. Minor's repeated refusals to provide Plaintiff with a form about certain personnel transactions, a decision that Secretary Washington countenanced (Pl. Dep., at 182–84, 189, 191–92; Minor Dep., at 18–19); and (5) Ms. Minor's "scolding" of Plaintiff for acting outside her authority in assisting another employee with a task (Pl. Dep., at 158–62; 167; 170; 238–39).

[8] *See also* Pl. Dep., at 146–47 (testifying that she believes Ms. Minor's actions were racially motivated because she "can't recall when [Minor] went to anyone else and tried to tell them how to run their divisions" and because she [Plaintiff] is "African American and [Minor's] not, so I do know how I felt"); Pl. Dep., at 147 (testifying that she believed that adverse treatment in the workplace "would be based on race if that's not something you did to everybody, but the person you happened to do it to is maybe African American"); Pl. Dep., at 399 (testifying that Ms., Minor engaged in "a pattern of mistreatment to me, and . . . I say it is based on my race"); Pl. Dep., at 402 (testifying: "I didn't hear [Ms. Minor] say [racially] derogatory things" but "I looked at the action. I don't need anyone responding for me. . . . . You know, that, to me, indicates a superior attitude").

*Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (internal quotation marks omitted)); *see infra* note 10.  Furthermore, Plaintiff points to no evidence that Ms. Minor had any impact or say so on the decision to terminate Plaintiff.  Rather, the undisputed evidence establishes that Mr. Washington alone made the decision to end Plaintiff's employment as labor administrator.  (*See, e.g.*, Pl. Dep., at 483–84, testifying that "I'm not suggesting that [Minor] put [Washington] up to it [*i.e.*, firing her]. . . .  I think he came up with that on his own," and "[n]o one can overturn his decisions").)  Hence, even if there were evidence that Ms. Minor harbored racially animosity toward Plaintiff, a non-decisionmaker's discriminatory action is not "probative of a[n employer's] discriminatory intent" behind a termination.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 53.

Plaintiff's reliance on Mr. Washington's allegedly unfair treatment fares no better.  That treatment encompasses the acts set out in Part III.A.,[9] plus Plaintiff's beliefs set out in the footnote.[10]  The treatment is race neutral, and Plaintiff's attempt

---

[9] The only other evidence she points to is Mr. Washington's comment in December 2018 that "someone" was watching her and reported that she came and went as she pleased.  (Pl. Dep., at 117; *see* Pl. Br. in Opposition to Summ. J., at 31.)

[10] *See, e.g.*, Pl. Dep., at 311 ("I think had someone else been in [my] position maybe who wasn't African American, [Washington] probably wouldn't have taken such a stern position on"

to portray it as racially discriminatory continues a speculative theme.  For example, as to her contention that Mr. Washington admonished only her, and not Joseph Ammons (who is white) for taking phone calls during a staff meeting, Plaintiff has not presented any evidence to rebut Mr. Washington's legitimate reason for the difference in treatment.  Mr. Washington admits that he did not admonish Mr. Ammons but explains that the call he took was related to his job duties as general counsel and that he (Mr. Washington) was anticipating the information received during the call.  (Washington's Decl. ¶ 32.)  There is no evidence, only speculation, that Mr. Washington treated white employees more favorably than he treated Plaintiff on the basis of race.

Accordingly, Plaintiff has not demonstrated a prima facie case that her termination was based on her race.

## C.   The Absence of Evidence that ADOL's Legitimate Reasons for Terminating Plaintiff Were Pretextual

Even if Plaintiff had demonstrated a prima facie case of retaliation or race discrimination, Defendant has proffered reasons that are both non-discriminatory and non-retaliatory for terminating Plaintiff.  These reasons are as follows.  Plaintiff worked in an exempt position held "solely at the pleasure of the appointing

---

my presentation); Pl. Dep., at 328, 422 (testifying in reference to Washington's email—"Let's ensure that your staff are working on projects and finishing in reasonable time for the outcome that lifts the agency"— that she "felt he [Washington] wouldn't tell anybody white that").

authority," who was Secretary Washington.  (Letter of Termination (Doc. # 28-9); Washington Decl. ¶ 10).)   Mr. Washington testified that he gradually became dissatisfied with Plaintiff's job performance and professional judgment based on events occurring between 2017 and 2019.  (Washington Dep., at 224–44 (testifying about these events).)   He described his overall discontent as constituting "philosophical differences" between his and Plaintiff's managerial styles.  (Washington Dep., at 224.)  Based on these differences, Mr. Washington notified Plaintiff in July 2019 that "effective the close of business December 31, 2019, [her] position w[ould] no longer be utilized."  (Letter of Termination.)  There is nothing facially discriminatory or retaliatory about these reasons, even if Plaintiff disagrees with them.  *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." (citation omitted), *abrogated on other grounds by Lewis*, 918 F.3d 1213.

The Eleventh Circuit has "repeatedly emphasized that provided the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc).  To rebut the reasons and thus establish

20

pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* A reason is not pretextual unless it shown that the reason is "false" and that discrimination or retaliation is the "real reason." *Id.* (citation omitted).

Plaintiff has not demonstrated weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Mr. Washington's reasons from which a reasonable factfinder could find them unworthy of credence. Plaintiff does not dispute that Mr. Washington "was well within his authority to discipline [her] for any of [his] asserted reasons . . . ." (Pl. Br. in Opposition to Summ. J., at 44.) She argues, however, that these reasons are not the actual reasons because she says Mr. Washington "never had any discussion or counseling sessions" with her concerning "her work ethic, work product, management of staff, or conflicts related to their differences in professional opinions." (Pl. Br. in Opposition to Summ. J., at 43–44.) Plaintiff does not properly cite any evidence to support her argument,[11] and the

---

[11] Plaintiff cites "Exhibit A." Exhibit A is her deposition testimony that spans 457 pages. Plaintiff's citation to "Exhibit A" violates the Uniform Scheduling Order ("USO"): "In all briefs filed by any party relating to the motion, the discussion of the evidence in the brief must be accompanied by a specific reference by page and line, to where the evidence can be found in a supporting deposition or document." (USO, § 2 (Doc. # 21).) The court is under no obligation to scour the record for evidence to support Plaintiff's arguments. (*See* USO, § 2 ("Failure to make such reference may result in the evidence not being considered by the court.").)

evidentiary record disproves her argument that the two had no discussions about her job performance.

During her deposition, Plaintiff agreed that she and Mr. Washington did not see "eye to eye" about how to handle the October 2017 incident (Pl. Dep., at 436), and that she took a different stance than Mr. Washington about how the December 2018 incident should be addressed (Pl. Dep., at 437–44).  Plaintiff also admitted that, based on her and Mr. Washington's discussions and emails, the two of them had "a difference of opinion" about whether she properly prepared for the March 2019 training presentation and that he told her that she and her presentation team "were not ready."  (Pl. Dep., at 294–300; Pl. Decl. ¶ 7 (Doc. # 28-6) ("I respectfully disagreed with Secretary Washington's criticism" of my presentation).)  Plaintiff also does not dispute that Mr. Washington tasked her in 2016 with ensuring that ADOL employees had updated evaluation forms that were consistent with their current duties, but that she failed to effectuate that goal for her subordinate, Ms. Scott.  (Pl. Dep., at 329 (testifying that Mr. Washington "accused [her] of ill-preparing the performance appraisal of Tonya Scott" because Scott did not "hav[e] an updated Form 40").)

While Plaintiff believes that Mr. Washington's criticisms were unfounded and that he was too quick to judge her, she cannot establish pretext "by simply quarreling with the wisdom of" his reasons.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th

Cir. 2000) (en banc).   And, even if Mr. Washington's critiques of Plaintiff's performance and of her professional judgment were wholly subjective, "subjective determinations are permitted under Title VII, and [a federal court] will not sit as a super-personnel department and reexamine an entity's business decision." *Jolibois v. Fla. Int'l Univ. Bd. of Trustees*, 654 F. App'x 461, 464 (11th Cir. 2016) (citing *Chapman*, 229 F.3d at 1030, 1033).

The reasons advanced by Mr. Washington for Plaintiff's termination easily satisfy the standard of being ones that might motivate an employer to fire an employee, and Plaintiff has failed to create a genuine dispute of material fact on the issue of pretext for both her discrimination and retaliation claims.  Her failure to adduce sufficient evidence of pretext is an additional reason why Defendant is entitled to summary judgment on Plaintiff's Title VII claims alleging a retaliatory and racially discriminatory termination.

## D.    **Title VII Hostile Work Environment Claim**

To establish a racially hostile-work-environment claim under Title VII, a plaintiff must prove that:

> (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment under a theory of vicarious or direct liability.

*Smelter*, 904 F.3d at 1284.  Plaintiff's claim falls flat on the third and fourth elements.

>    **1.    *Third Element (Based on Race)***

For a Title VII hostile work environment claim to succeed, the objectively offensive conduct must be connected to race discrimination.   *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *see also Howard v. United Pruitt Corp.*, 196 F. App'x 780, 781 (11th Cir. 2006) (affirming summary judgment on the plaintiff's hostile work environment claim where the plaintiff "failed to offer any evidence that any of the[ ] incidents were related to her race"); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (The "statements and conduct [complained of] must be of a [racial] nature . . . before they are considered in determining whether the severe or pervasive requirement is met."), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 53.

Here, there is no evidence of racist remarks, either overt or covert, and Plaintiff concedes as much.  (*See, e.g.*, Pl. Dep., at 140, 146–47, 166, 247.)  Plaintiff also has not pointed to any evidence from which to infer that racial biases motivated the treatment.  The testimony to which she points relies on rank speculation.  (*See e.g.*, Pl. Br. in Opposition to Summ. J., at 35 (citing Pl. Dep., at 167–68 (opining that "the fact that" Minor is white "suggest[s]" that Minor viewed Plaintiff as incapable to perform her job); Pl. Dep., at 117, 495–96 (testifying that Washington's

24

statement—that "someone" had been keeping track of her work schedule and had informed him that Plaintiff "come[s] and go[es]" as she pleases—"was related to race" because "other [white] directors came and went" without taking leave))); *see also* Pl. Dep., at 310–11 (testifying that she "think[s]" that "had someone else been in [her] position maybe who wasn't African American," Mr. Washington "wouldn't have taken such a stern position" on her presentation).)  The evidence falls far short of establishing that any of the complained-of treatment "was based on [Plaintiff's] race." *Smelter*, 904 F.3d at 1284.

## 2. *Fourth Element (Sufficiently Severe or Pervasive Harassment)*

Even if the offending conduct was based on Plaintiff's race, her claim still would fail because the conduct is insufficiently severe or pervasive to alter the terms and conditions of her employment.  The objective component of the fourth element "tests the mettle of most sexual harassment claims."  *Gupta*, 212 F.3d at 583, *overruled on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53.  The work environment must be "objectively . . . offensive, one that a reasonable person would find hostile or abusive . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  The standard for assessing the hostility and abusiveness of the work environment "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  *Id.* at 788 (citation omitted).  Factors bearing on the objective component include:  "(1) the frequency of the conduct; (2) the severity of

25

the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 837 (11th Cir. 2021). These factors must be viewed "cumulatively and in the totality of the circumstances." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020).

Plaintiff's race-based hostile work environment claim is premised on the conduct of Mr. Washington and Ms. Minor and possibly Ms. Scott.[12] In the hostile work environment section of her opposition brief, Plaintiff relies on the same treatment by Mr. Washington and Ms. Minor that was sifted earlier in this opinion. That treatment includes Mr. Washington's travel freeze, his criticism that her joint presentation was ill-prepared, his comment that Plaintiff disrupted a staff meeting by taking personal calls, Ms. Minor's unsolicited suggestions to Plaintiff that two of Plaintiff's employees needed additional training in specified areas, and the denial, without explanation, of access to a personnel report. (*See* Pl. Br. in Opposition to Summ. J., at 34–35 (discussing the alleged harassment).)

---

[12] Plaintiff initially testified that the conduct of Ms. Scott, the EEO manager and Plaintiff's subordinate, was not part of her hostile work environment claim. (Pl. Dep., at 497, 528.) Later during her deposition, Plaintiff changed course and testified that the conduct of Ms. Scott, who is African American, was racially motivated because Plaintiff did not "know of anyone else she" acted the same toward. (Pl. Dep., at 529.) That conduct appears to be what Plaintiff describes as Ms. Scott's "spying" on her and Ms. Scott's failure to conduct an investigation of Mr. Washington's hiring of a white director. (Pl. Br. in Opposition to Summ. J., at 6 (citing Pl. Dep., at 396), at 8 (citing Pl. Dep., at 285).)

Viewed in the light most favorable to Plaintiff and drawing all inferences in her favor, these acts—considered collectively—are neither severe nor pervasive as a matter of law.  First, there is insufficient evidence that the harassment was frequent when compared to cases where the Eleventh Circuit has found a hostile work environment.  *See, e.g., Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 804 (11th Cir. 2010) (reversing summary judgment entered for an employer on a hostile work environment claim where the plaintiff claimed her co-workers made obscene and derogatory comments about her and women in general "on a daily basis"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (holding that the harassment was frequent where a co-worker "hurled . . . ethnic slurs at [the plaintiff] three to four times a day . . . throughout the approximately one month period the two men were both employed at Kenworth"); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999) (reversing summary judgment for an employer where the plaintiff alleged "almost-daily abuse").

Second, Plaintiff has not shown that the conduct was severe.  Conduct rises to the level of severe when it causes the employee's workplace to become "permeated with discriminatory intimidation, ridicule, and insult." *Buckhanon v. Huff & Assocs. Const. Co.*, 506 F. Supp. 2d 958, 966 (M.D. Ala. 2007) (citations omitted).  None of the conduct Plaintiff complains of was racially charged or tinged.  Plaintiff admits, for example, that Ms. Minor never mentioned race or said anything racially

derogatory to her (*see, e.g.*, Pl. Dep., at 140, 401), and she points to no evidence that Mr. Washington ever said anything racially insensitive to her.  While it is clear that Plaintiff's professional relationships with Mr. Washington and with Ms. Minor gradually deteriorated during her tenure as labor administrator, the treatment of which she complains is akin to "ordinary tribulations of the workplace," and not to severe discriminatory conduct.  *Faragher*, 524 U.S. at 787 (giving examples of "ordinary tribulations" in the context of a sexual harassment case as "the sporadic use of abusive language, gender-related jokes, and occasional teasing" (citation omitted)).  As Plaintiff herself admits, some of the treatment was just "childish," including the "negative talk behind [her] back," and other conduct amounted to at best unfounded criticisms of her job performance.  (Pl. Dep., at 345, 402.)

Third, Plaintiff also has not presented any evidence of treatment that was physically threatening; she merely was offended.  Fourth, she has not explained how the offending acts interfered with her job performance.

Evidence is lacking on all four factors for testing the severity and pervasiveness of the alleged harassment.  A reasonable juror could not conclude on this record that Plaintiff's work environment was objectively severe or pervasive to create a hostile work environment.

Because Plaintiff fails to raise a genuine dispute of material fact on two elements of her Title VII hostile work environment claim, summary judgment on this claim is due to be entered in favor of Defendant.

## V.  CONCLUSION

The frustrations that Plaintiff felt from her boss and colleagues during her tenure as labor administrator for the ADOL may or may not warrant sympathy, but they do not warrant relief under Title VII.  All claims fail to survive scrutiny under the summary judgment standard.  Defendant, therefore, is entitled to summary judgment on Plaintiff's Title VII claims alleging a retaliatory termination, racially discriminatory termination, and racially hostile work environment.  Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 24) is GRANTED.

Final judgment will be entered separately.

DONE this 30th day of December, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE